UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SHUAY'B GREENAWAY, SHARON KNIGHT,          :
and AVERY KNIGHT,                                          :
                                                                   :
                                     Plaintiffs,          :      **DECISION AND ORDER**
                                                                   :      11-CV-2024 (WFK) (AKT)
                  -*against*-                                :
                                                                   :
COUNTY OF NASSAU AND NASSAU                   :
COUNTY POLICE OFFICERS SGT. VINCENT    :
PAPA, in his individual and official capacities,   :
P.O. RONALD SCHMITT, in his individual and   :
official capacities, P.O. CLARENCE HUDSON,    :
in his individual and official capacities, and       :
P.O. WILLIAM STIO, in his individual and         :
official capacities, INCORPORATED VILLAGE   :
OF HEMPSTEAD AND VILLAGE OF                    :
HEMPSTEAD POLICE OFFICERS P.O. FRANE   :
REDO, in his individual and official capacities,   :
And P.O. WALTER OHR, in his individual and    :
official capacities,                                             :
                                                                   :
                                     Defendants.          :
-----------------------------------------------------------------X
**WILLIAM F. KUNTZ, II, United States District Judge:**

 Plaintiffs Shuay'b Greenaway, his mother Sharon Knight, and his stepfather Avery
Knight (collectively "Plaintiffs") bring this suit under 42 U.S.C. § 1983, the Fourth, Fifth, and
Fourteenth Amendments of the United States Constitution, and New York State common law,
against the County of Nassau ("Nassau County"), Nassau County Police Officers Vincent Papa,
Ronald Schmitt, Clarence Hudson, and William Stio, the Incorporated Village of Hempstead
("Hempstead"), and Hempstead Police Officers Frane Reado and Walter Ohr (collectively
"Defendants"). Plaintiff Greenaway alleges causes of action for false arrest and imprisonment,
excessive force, and violations of substantive due process in violation of Section 1983, and
assault, battery, gross negligence, and trespass in violation of New York state law. All Plaintiffs
further allege causes of action for intentional infliction of emotional distress or, in the alternative,
negligent infliction of emotional distress. Nassau County ("Nassau"), Vincent Papa, Ronald
Schmitt, Clarence Hudson, and William Stio (collectively the "Nassau Defendants") filed a
motion for summary judgment. For the reasons discussed below, the Nassau Defendants' motion
is hereby GRANTED on the substantive due process, negligence, and intentional infliction of
emotional distress claims, and DENIED on the false imprisonment, excessive force, assault,
battery, and trespass claims, as well as on the Nassau Defendants' claim of qualified immunity.

1

## BACKGROUND

The events recounted below are undisputed or described in the light most favorable to Plaintiffs, the non-moving parties. *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005).

### Greenaway's Health and History

Plaintiff Shuay'b Greenaway ("Greenaway") is a field engineer at Extreme Installs, is married to Melissa Prentice Greenaway, and has a young son. Dkt 47-1 ("Pl. Counter-Statement") at ¶¶ 7-8.

In 2002, Greenaway was diagnosed with bipolar disorder. *Id.* at ¶ 11. As a result, when Greenaway's mental health "decompensated," he would display a number of non-violent behavioral oddities. *Id.* at ¶¶ 15-16. In 2007 and 2009, Greenaway's mother, Sharon Knight ("Mrs. Knight"), called 911 to request assistance with transporting her son to the hospital for treatment for his mental health condition. *Id.* at ¶¶ 39, 41. During the 2007 and 2009 incidents, Greenaway was reluctant to go to the hospital, but did not commit or threaten any violence against the Village of Hempstead police officers who appeared on the scene pursuant to the 911 requests. *Id.* at ¶¶ 38, 40, 42, 44; Dkt. 46-1 ("Def. Material Facts") at ¶¶ 11-12.

### Events of April 25, 2010

On April 25, 2010, Greenaway did not take his dosage of Risperdal, the medication he had been prescribed for his mental illness. Pl. Counter-Statement at ¶¶ 19, 29, 31. Mrs. Knight called 911 for assistance with her son whom she described to the operator as "not dangerous" but in need of help; the operator called the police. Dkt. 46-2 ("Preston Decl.") Ex. B at 19:9-20:25. At the time, Greenaway was a 32-year-old student at Nassau Community College weighing

approximately 220-230 pounds and standing approximately five feet nine inches (5'9") tall. Pl. Counter-Statement at ¶¶ 10, 13. He had no history of violence. *Id.* at ¶ 37.

Village of Hempstead police officers Reado (misspelled as "Redo" in the caption) and Ohr (collectively the "Hempstead Police Officers") arrived on the scene at 221 Amherst Street, Hempstead, New York, followed by Nassau police officers Papa, Schmitt, Hudson, and Stio (collectively the "Nassau Police Officers"). Def. Material Facts at ¶¶ 14-15, 20. Plaintiff Greenaway was preparing to move into the house at that address, which was owned by Mrs. Knight and her husband Avery Knight ("Mr. Knight"). Dkt. 47-1 ("Pl. Disputed Facts") at ¶ 1; Pl. Counter-Statement at ¶ 6. The Nassau Police Officers had received a call about a "mental aided" person at the location. Def. Material Facts at ¶19. However, the Nassau Police Officers did not make inquiries about Greenaway's specific mental health condition, background, or behavior before interacting with Greenaway, as required by Nassau County Police Department policy. Pl. Counter-Statement at ¶ 79. Consequently, the Nassau police officers began their interaction with Greenaway knowing very little about his condition or current behavior. *Id.* at ¶¶ 60, 83.

Greenaway was inside the bathroom, painting, when the Nassau Police Officers first saw him. Dkt. 37 ("Am. Complaint") at ¶¶ 29, 45-47. Greenaway was speaking with Hempstead police officer Reado; however, Greenaway was not cursing, being violent, or making threats. Pl. Counter-Statement at ¶ 91. The Nassau and Hempstead Police Officers decided that Greenaway needed to go to the hospital. Def. Material Facts at ¶ 24. When Greenaway would not leave the bathroom, the Nassau and Hempstead Police Officers physically ejected Mr. and Mrs. Knight from the bedroom adjacent to the bathroom. Def. Material Facts at ¶¶ 27-30; Pl. Disputed Facts at ¶¶ 27-30; Pl. Counter-Statement at ¶¶ 95-99. Mr. Knight told the Nassau Police Officers to

leave his home. Pl. Counter-Statement at ¶ 104. One or more of the Nassau Police Officers then tased Greenaway three or four times. Dkt. 47-2 ("Brewington Decl.") Ex. I at 69-70; Def. Material Facts ¶ 38. The second and third tasings occurred in stun mode, with the taser held next to Greenaway's body. Brewington Decl. Ex. E at 75-76, 84.

The Nassau Defendants claim that, before they first tased Greenaway, Greenaway "threatened" the Nassau Police Officers with a paint roller (though Defendant Papa also described this as Greenaway "trying to play games"), took his pants off, rubbed paint on his genitals, and made taunts. Def. Material Facts at ¶¶ 35-36; Brewington Decl. Ex. E. at 64, 67; Ex. G at 55-56, 60; Ex. H at 50-51, 59. Plaintiffs deny any threatening behavior by Greenaway. Pl. Disputed Facts at ¶ 35. Plaintiffs point out that Defendant Stio himself stated that Greenaway only used the paint roller to paint and makes no mention of "threats," and that Nassau County Ambulance Medical Technician Arce said Greenaway never made threats or committed violence before being tased. Brewington Decl. Ex. F at 44, 50; Ex. I at 73-74. Plaintiffs further deny that Greenaway was ever rubbing paint on his genitals, stating that he became covered with paint when he fell down on the paint-covered floor after being tased. Pl. Disputed Facts at ¶ 36; Brewington Decl. Ex. C at 55.

The Nassau Defendants allege that, after Greenaway was tased, he reached for Papa's weapon; they further allege that, after Greenaway was tased a second and third time, he "brought the officers down to the floor," "swung punches" at them, and ripped off Schmitt's shirt and undershirt. Def. Material Facts at ¶¶ 48-49. Plaintiffs deny any such struggle. Pl. Disputed Facts ¶¶ 48-49.

4

**Physical and Psychological Aftermath**

Greenaway suffered puncture wounds as a result of the taser shots and had to see a doctor for painful and persistent swelling on his chest. Pl. Counter-Statement at ¶¶ 52, 212. Greenaway now has a permanent scar on his chest from the taser shots. *Id.* at ¶ 211. Furthermore, Greenaway saw a mental health professional for treatment for the anxiety resulting from being tased. *Id.* at ¶¶ 168, 213.

The Nassau and Hempstead police officers were uninjured during the April 25, 2010 incident. *Id.* at ¶154.

Mrs. Knight believed her son was dead after the taser shots and attempted to pull off the sheet that had been placed over him, at which point Ohr pushed her away. *Id.* at ¶ 153. The police officers did not permit Mr. and Mrs. Knight to ride in the ambulance to the hospital with their son. *Id.* at ¶ 154. Furthermore, Mr. Knight experienced great emotional distress from witnessing the police officers' treatment of his stepson and wife, causing him to miss "a number of days of work." *Id.* at ¶¶ 214-215.

In October 2010, Greenaway's mental health began to "decompensate" again. *Id.* at ¶¶ 164-165. After the April 25, 2010 incident, Mrs. Knight was strongly reluctant to call the Mobile Crisis Outreach Team ("MCOT") operating out of Nassau University Medical Center ("NUMC") for help with Greenaway, because she understood the MCOT would be accompanied by police officers. *Id.* at ¶¶ 165, 169-170. Despite this reluctance, Mrs. Knight's concern for Greenaway led her to call the Unit for help. *Id.* at ¶ 171. Greenaway went peacefully with the Unit when it arrived. *Id.* at ¶ 176.

**Nassau County Police Department Policies and Investigation**

The Nassau County Police Department Procedure No. OPS 1155 contains instructions for police officers interacting with the mentally disabled. *Id.* at ¶ 178. For example, upon arrival at the scene, a police officer must, after assessing the situation and securing the area, try to obtain background information on the mentally disabled person, such as "mental/medical history," "prescription/illegal drugs being taken," "current problem," "behavior prior to police arrival," and "past violent behavior." Brewington Decl., Ex. M at 2. He or she is then to determine whether or not the person's behavior is "likely to result in serious harm" to themselves or other persons. *Id.* at 1-2. The definition of behavior "likely to result in serious harm" is (1) "suicide or serious bodily harm," or "other conduct" indicating danger to self, such as "refusal or inability to meet his essential need for food, shelter, clothing, or health care," or (2) "homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm." *Id.* at 1. If the mentally disabled person's behavior is not likely to result in serious harm, the police officer is to notify the Desk Officer and consider referring the situation to the MCOT. *Id.* at 2.

As stated above, the Nassau Police Officers did not make inquiries about Greenaway's background or specific condition; they also did not call the MCOT. Pl. Counter-Statement at ¶¶ 79, 183. The Internal Affairs Division of the Nassau County Police Department conducted an investigation of the April 25, 2010 incident, which resulted in none of the officers being disciplined. *Id.* at ¶¶ 201-202, 205-208.

Greenaway was never charged with a crime in connection with the April 25, 2010 incident. *Id.* at ¶ 160.

**Procedural History**

Plaintiffs filed a complaint on April 25, 2011, an amended complaint on January 17, 2012, and a second amended complaint on January 8, 2013. Dkt. 1; Dkt. 15; Am. Complaint. Plaintiffs sue the Nassau Police Officers under 42 U.S.C. § 1983 for Fourth and Fourteenth Amendment violations including false imprisonment, excessive force, and substantive due process violations and allege that Nassau has municipal liability. Am. Complaint at ¶¶ 117-138; Dkt. 47 ("Pl. Opp.") at i, 2. Plaintiffs further allege state law claims of gross negligence and vicarious liability or *respondeat superior* against the Nassau Defendants. Am. Complaint at ¶¶ 161-184. Finally, Plaintiffs allege state law claims of false imprisonment, arrest, assault, battery, trespass, and intentional infliction of emotional distress or, in the alternative, negligent infliction of emotional distress against the Nassau Police Officers. *Id.* at ¶¶ 185-216; Pl. Opp. at 24-25. Plaintiffs ask for damages, including punitive damages, in the amount of fifty million dollars ($50,000,000). Am. Complaint at 48.

The Nassau Defendants filed an answer on July 18, 2011, an amended answer on October 7, 2011, and answers to the amended complaint and to the Hempstead Defendants' cross-claims on August 1, 2012. Dkt. 3; Dkt. 12; Dkt. 32; Dkt. 33.

On September 18, 2013, the following papers were filed: the Nassau Defendants' motion for summary judgment, Plaintiffs' memorandum in opposition to summary judgment, and the Nassau Defendants' reply in support of summary judgment. Dkt. 46-3 ("SJ Motion"); Pl. Opp.; Dkt. 48 ("Def. Reply"). In their summary judgment motion, the Nassau Defendants make the following claims: (1) their imprisonment of Greenaway was privileged; (2) they did not use excessive force; (3) there was no substantive due process violation; (4) Nassau has no municipal liability; (5) Plaintiffs' negligence claims must fail; (6) Plaintiffs' trespass claim must fail; and

(6) Plaintiffs failed to state a claim for intentional infliction of emotional distress SJ Motion at i-ii. The Nassau Police Officers also claim qualified immunity. *Id.* at ii. The Court addresses each argument in turn.

## ANALYSIS

### I.      Summary Judgment Standard.

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried. In determining whether summary judgment is appropriate, this Court will construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks and citations omitted). No genuine issue of material fact exists "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

If the moving party satisfies this burden, the non-moving party must "make a showing sufficient to establish the existence of [each] element to that party's case . . . since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Importantly, if the evidence produced by the non-moving party "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (internal citations omitted).

## II. Parties Dispute Material Facts Regarding Plaintiffs' Fourth Amendment and State Law False Imprisonment Claims.

The Court analyzes Plaintiff's claims of false imprisonment under the Fourth Amendment, which provides an "explicit textual source of constitutional protection" against unreasonable search and seizure. *Albright v. Oliver*, 510 U.S. 266, 273-74 (1994) (internal quotation marks omitted) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). The law of the state in which the imprisonment occurred governs the analysis of a false imprisonment claim (and, analogously, a false arrest claim). *Jaegly v. Couch*, 439 F.3d 149, 151-152 (2d Cir. 2006); *see also Wallace v. Kato*, 549 U.S. 384, 388-389 (2007) (discussing overlap between the torts of false arrest and false imprisonment). A Fourth Amendment claim of false imprisonment brought under 42 U.S.C. § 1983 is "substantially the same" as a false imprisonment claim under New York State law. *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). Probable cause is a complete defense to both Fourth Amendment and New York State law claims of false imprisonment. *Id.* (citing *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) and *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995)). Therefore, the Court will analyze the § 1983 and New York State false imprisonment claims together.

To state a claim for false imprisonment, a plaintiff must allege: (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged. *Id.* at 853 (internal quotation marks and citations omitted). Confinement of an individual is privileged under New York State Mental Hygiene Law § 9.41 if the individual is "conducting himself...in a manner which is likely to result in serious harm to [himself] or others." N.Y. Mental Hyg. Law § 9.41. Where the plaintiff has been involuntarily confined

under N.Y. Mental Hyg. Law § 9.41, courts apply the same concepts of probable cause and objective reasonableness as in criminal cases to determine whether the confinement is privileged because the plaintiff's behavior was likely to result in serious harm. *See, e.g.*, *Kerman v. City of New York*, 261 F.3d 229, 240 n.8 (2d Cir. 2001). "The Fourth Amendment requires that an involuntary hospitalization may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard." *Glass v. Mayas*, 984 F.2d 55, 58 (2d Cir. 1993) (internal quotation marks and citations omitted).

The Nassau Defendants claim they had probable cause to confine Plaintiff Greenaway because he was behaving in a manner likely to result in serious harm to himself or others. SJ Motion at 7-8. The Nassau Defendants support this claim with the Nassau Police Officers' testimony that Plaintiff Greenaway had not taken his medication, his behavior was "bizarre and unreasonable," he "taunted" the police officers and made "threatening gestures" with a paint roller, he "stripped naked," and he was rubbing paint on his body, including on his genitals. SJ Motion at 7; Def. Material Facts at ¶ 35. Plaintiffs deny any "threats" or "taunts." They state that Greenaway was at all times calm and peaceful, he only began to remove clothes after the first taser shot because of the intense heat, and he never rubbed paint on himself, but instead got paint on his body by falling onto the paint-covered bathroom floor. Pl. Opp. at 4-5, 7-8; Pl. Disputed Facts at ¶36. Plaintiffs support their claims with their own testimony, with Greenaway's non-violent history, and with contradictions in the Nassau and Hempstead Police Officers' testimony. Pl. Opp. at 4-5, 7-8, 14-15. Plaintiffs further point out that Greenaway had only been off his medication for one day, his symptoms while unmedicated did not include violence, and therefore he did not think he required hospitalization. Pl. Opp. at 8.

Even if the Court accepts the Nassau Defendants' account of events in full, which is not the standard on summary judgment, there still remain genuine issues of material fact. The Nassau Defendants fail to show that engaging in "bizarre and unreasonable" behavior, including stripping naked and rubbing paint on oneself inside one's own residence, is "likely to result in serious harm to the person or others." N.Y. Mental Hyg. Law § 9.41. Nor do the Nassau Defendants show that making gestures that some officers interpreted as "threatening" is clearly grounds for involuntary hospitalization as a matter of law. New York law defines "likely to result in serious harm" as having a "substantial risk" of harm to self or others, "as manifested by threats of[,] or attempts at[,] suicide or bodily harm[,] or other conduct demonstrating that he is dangerous to himself," or by "homicidal or other violent behavior" that places others "in reasonable fear of serious physical harm." N.Y. Mental Hyg. Law § 9.01. The Nassau Defendants do not show or even allege that Greenaway's behavior included threats of or attempts at suicide or bodily harm to himself. Nor do they show that his behavior placed others in reasonable fear of serious physical harm. A reasonable finder of fact could decide that, even if the Nassau Defendants have stated the facts accurately, Greenaway's behavior did not rise to the level of being "likely to result in serious harm."

To support their claim that they had probable cause to confine Greenaway, the Nassau Defendants compare the instant case to *Bayne v. Provost*, 04-CV-44, 2005 WL 1871182, at *9 n.6 (N.D.N.Y. Aug. 4, 2005) (McAvoy, J.). SJ Motion at 6-7. However, the facts of *Bayne* are markedly different from those here. In *Bayne*, the plaintiff's home-care nurse called the police and told them the plaintiff was suicidal. *Bayne*, 2005 WL1871182 at *1-2. In addition to receiving a phone call from a medical professional alleging threats of suicide, the *Bayne* defendants spoke to the nurse after their arrival on the scene, confirmed her account of the

plaintiff's suicide threat, and observed that the plaintiff had multiple bottles of pills which the defendants could not identify and might have been fatal. *Id.* at \*2-3. The court determined that "[t]he facts and circumstances known to the [officer]s at the time they made the decision to confine [plaintiff] were sufficient to warrant a person of reasonable caution in the belief that a seizure was legally justified under [N.Y. Mental Hyg. Law § 9.41]." *Id.* at \*7.

In the instant case, however, there was no confirmed suicide threat. Additionally, unlike the *Bayne* defendants, the Nassau Police Officers conducted no investigation as to Greenaway's behavior and history, as required by Nassau policy. Pl. Opp. at 6.

Furthermore, a reasonable finder of fact need not accept the Nassau Defendants' account in full. Plaintiffs' account of events is uncontradicted by any physical or documentary evidence. Indeed, Plaintiffs' account is corroborated by Greenaway's previous and subsequent non-violent behavior towards medical and law enforcement personnel who hospitalized him during other episodes. Pl. Counter-Statement at ¶¶ 38, 176. The most violent behavior that Nassau Defendants' can point to by Greenaway is that Greenaway and a neighbor "pushed" each other the morning of April 25, 2010. Pl. Counter-Statement at ¶¶ 22, 25; Def. Material Facts at ¶ 5. The Nassau Defendants themselves concede that Greenaway has a history of peaceful interaction with law enforcement personnel during his mental health-related episodes. Def. Material Facts at ¶¶ 11-13. Plaintiffs' account is further supported by the short length of time Greenaway had spent unmedicated and his usual non-violent symptoms displayed while unmedicated. Pl. Opp. at 8. A reasonable finder of fact could consider Plaintiffs' account of events more credible than the Nassau Defendants'. *See, e.g.*, *Kerman*, 261 F.3d at 241 (reversing a grant of summary judgment in § 1983 case of involuntary hospitalization where there were conflicting accounts of material facts). Therefore, the Court DENIES the Nassau Defendants' motion for summary

judgment on Plaintiffs' false imprisonment claims under the Fourth Amendment, 42 U.S.C. §1983, and New York State law.

### III. Parties Dispute Material Facts Regarding Plaintiffs' Trespass Claim.

The Nassau Defendants support their motion for summary judgment on Plaintiffs' trespass claims only by referring the Court to the same argument presented with respect to the false imprisonment claims: the Nassau Police Officers had probable cause to think Greenaway's behavior was likely to result in serious harm to himself or others, making their actions privileged pursuant to N.Y. Mental Hyg. Law § 9.41. SJ Motion at 18. Therefore, for the reasons described above, the Court hereby DENIES the Nassau Defendants' motion for summary judgment on Plaintiffs' trespass claim as well.

### IV. Parties Dispute Material Facts Regarding Plaintiffs' Fourth Amendment Excessive Force Claim and State Law Assault and Battery Claims.

Excessive force under the Fourth Amendment is evaluated on the basis of whether the amount of force was "objectively reasonable in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (internal quotation marks and citations omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396 (citation omitted). Courts must carefully consider the "facts and circumstances of each particular case[.]" *Id.* Because objective reasonableness is extremely fact-specific, summary judgment on the issue is often inappropriate. *See, e.g.*, *Terranova v. Torres*, 603 F. Supp. 2d 630, 632 n.3 (S.D.N.Y. 2009) (Young, J.). The repeated use of a taser has, in certain situations, been deemed excessive force. *See, e.g.*, *Estate of*

*McDonnell ex. rel. McDonnell v. Bressingham*, 11-CV-4221, 2014 WL 5427975 (E.D.N.Y. Oct. 23, 2014) (Kuntz, J.).

Here, the Nassau Defendants claim the triple tasing of Greenaway (or quadruple tasing, according to Plaintiffs' account) was objectively reasonable as a matter of law. For support, the Nassau Defendants rely on an Eleventh Circuit case, *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004), *cert. denied*, 543 U.S. 988 (2004), wherein the plaintiff Draper was stopped while driving, tased, and arrested. Even if this Court were to consider *Draper* for its persuasive but not binding value, the facts of *Draper* differ significantly from those here. In *Draper*, the Eleventh Circuit found probable cause for the plaintiff's arrest; since "[i]t is well settled that the right to make an arrest 'necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it[,]'" an officer with established probable cause for arrest must have more leeway than an officer without. *Draper*, 369 F.3d at 1278 (quoting *Graham*, 490 U.S. at 396).

In this case, however, there are genuine questions of fact regarding whether the Nassau police officers had any right to confine Greenaway at all, as discussed above. Furthermore, as the Eleventh Circuit noted, the plaintiff Draper was tased once; Greenaway, by contrast, was tased multiple times. *Draper*, 369 F.3d at 1278; Def. Material Facts at ¶¶46-47. There are also genuine questions of fact regarding whether, after the first tasing, Greenaway "wrestled" with the officers and attempted to grab an officer's weapon. SJ Motion at 10; Pl. Opp. at 15. The Nassau Defendants themselves only allege any such "wrestling" and "struggle" *after* the first taser shot. Def. Material Facts at ¶¶ 40-48.

Based on these allegations of fact, a reasonable jury could conclude that the officers had no right to arrest Greenaway and that Greenaway did not pose a threat to officer safety, thus

precluding a grant of summary judgment. *See, e.g.*, *Garcia v. Dutchess Cnty.*, 43 F.Supp.3d 281, 290-95 (S.D.N.Y. 2014) (Stein, J.). In *Garcia*, the court denied summary judgment for an officer who twice tased a man who had been talking about knives and rummaging through kitchen drawers. *Id.* at 291. As the court explained, there were many factual disputes, including about whether the man posed a threat to officer safety and whether he was resisting arrest. *Id.* at 291-93. The court in *Garcia* further noted the existence of "a consensus among those federal courts of appeals to have reached the issue that it is generally . . . unreasonable to deploy a taser against a misdemeanant who is not actively resisting arrest." *Id.* at 295 (internal quotation marks and citations omitted) (ellipses in original) (collecting cases). Here, where Greenaway is not alleged to be a "misdemeanant" at all, and where there are numerous disputed material facts regarding whether he "actively resisted arrest," the Nassau Defendants cannot succeed in their argument that the tasing was objectively reasonable as a matter of law.

The Nassau Defendants further claim that Greenaway must show physical injury resulting from the alleged excessive force to prevail, relying on *Landry v. Irizarry*, 884 F. Supp. 788, 797 (S.D.N.Y. 1995) (Wood, J.). However, *Landry* has no such requirement. *Landry* states that "[a]n arrestee must prove some injury, even if insignificant, to prevail in an excessive force claim." *Id.* at 799 n.14. *Kerman* provides an illustrative example of a sufficient injury: in *Kerman*, the Second Circuit reviewed its past cases and concluded that "handcuff tightening, infliction of pain, verbal abuse, humiliation and unnecessary confinement to a restraint bag" could lead a reasonable jury to find the use of force "objectively unreasonable and therefore excessive." *Kerman*, 261 F.3d at 239-240 (citations omitted). Here, Greenaway's injuries include extreme pain from the taser, bleeding from puncture wounds, unconsciousness, emotional distress, and a scar on his chest. Pl. Opp. at 16. The Court cannot find, as a matter of

law, that Greenaway has not established sufficient injury for purposes of establishing excessive force.

Therefore, for the reasons stated above, the Court DENIES the Nassau Defendants' motion for summary judgment on Plaintiffs' Fourth Amendment excessive force claim. Moreover, since "[a]ssault and battery claims under New York law and Fourth Amendment excessive force claims are evaluated pursuant to the same standard" of objective unreasonableness, the Court hereby DENIES the Nassau Defendants' motion for summary judgment on the state law assault and battery claims as well. *Cosby v. City of White Plains, N.Y.*, 04-CV-5829, 2007 WL 853203, at *6 (S.D.N.Y. Feb. 9, 2007) (Yanthis, Mag. J).

## V.     Plaintiffs Cannot Claim Substantive Due Process Violation Because Their Claim is Covered by the Fourth Amendment.

A plaintiff cannot succeed on a substantive due process claim where the state action in question is a Fourth Amendment seizure. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 843-844 (1998); *Terranova v. New York*, 144 F. App'x 143, 147 (2d Cir. 2005). Here, as discussed in Sections II and IV above, the complained-of conduct occurred in the course of the Nassau police officers' seizure of Greenaway. Therefore, Plaintiffs cannot claim a violation of substantive due process. The Nassau Defendants' summary judgment motion on the substantive due process claim is hereby GRANTED.

## VI.     Summary Judgment on Municipal Liability would be Premature.

Nassau can only be held liable for its police officers' actions under 42 U.S.C. § 1983 if those actions result from Nassau's custom, practice or policy; *respondeat superior* or vicarious liability does not attach to § 1983 claims. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-691 (1978); *see also Reynolds v. Giuliani*, 506 F.3d 183, 191 (2d Cir. 2007). Courts within the

Second Circuit apply a two-prong test to determine municipal liability, wherein a plaintiff must show (1) the existence of a policy or custom, and (2) a causal connection between the policy and the deprivation of the plaintiff's constitutional rights. *Johnson v. City of New York*, 06-CV-9426, 2011 WL 666161, at \*3 (S.D.N.Y. Feb. 15, 2011) (Daniels, J.). A policy or custom may exist where there is a "practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware" or where there is a "failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Id.* (internal citations and quotation marks omitted). Where a municipality has a constitutionally valid stated policy, but fails to implement it, the municipality may be liable for failure to train or supervise. *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 127 n.7 (2d Cir. 2004).

A single incident of misconduct involving an employee below the policy-making level generally will not show a policy or custom, even if the municipality fails to discipline the employee. *See, e.g.*, *Brewster v. Nassau Cnty.*, 349 F. Supp. 2d 540, 549 (E.D.N.Y. 2004) (Hurley, J.); *Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 532 (S.D.N.Y. 2012) (Karas, J.) (discussing cases showing that a single act by an employee will not suffice for municipal liability). However, "[a] single action taken by a *municipality* is sufficient to expose it to liability," including a "single instance of deliberate indifference to subordinates' actions." *Amnesty Am.*, 361 F.3d at 125, 127 (emphasis added). Moreover, "a single, unusually brutal or egregious beating administered by a group of municipal employees" may support an inference that the conduct was "attributable to inadequate training or supervision amounting to deliberate

indifference . . . on the part of officials in charge." *Turpin v. Mailet*, 619 F.2d 196, 202 (2d Cir. 1980).

For a failure to train to amount to deliberate indifference, a plaintiff must show that (1) a policy maker "knows to a moral certainty that her employee will confront a given situation," (2) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation," and (3) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Green v. City of New York*, 465 F.3d 65, 81 (2d Cir. 2006) (internal citations and quotation marks omitted). Furthermore, to avoid summary judgment on the issue of failure to train amounting to deliberate indifference, a plaintiff must "identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Id.* (internal quotation marks omitted) (citing *Amnesty Am.,* 361 F.3d at 129).

To show deliberate indifference through failure to supervise, a plaintiff must establish "only that a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was obvious . . . and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction." *Amnesty Am.*, 361 F.3d at 128 (internal quotation marks omitted) (citing *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)). A county police commissioner is generally considered a policymaking official. *See, e.g., Gashi v. Cnty. of Westchester*, 02-CV-6934, 2005 WL 195517, at *13 (S.D.N.Y. Jan. 27, 2005) (Daniels, J.) (collecting cases).

The Nassau Defendants argue that Plaintiffs offer no specific factual allegations to support the inference that the Nassau Police Officers' acts were due to a Nassau custom, practice or policy, or to a failure to train, supervise or discipline the Nassau police officers. The Nassau Defendants further argue that Plaintiffs cannot assert municipal liability on the basis of an isolated incident. SJ Motion at 14-15. In response, Plaintiffs cite to testimony by the Nassau police officers demonstrating ignorance of Nassau's own policy, derived from New York state law, requiring them to make preliminary inquiries before engaging with Greenaway. Pl. Opp. at 22. Plaintiffs also cite an Internal Affairs investigation by Nassau that resulted in no re-training or discipline for any of the four Nassau Police Officers. *Id.* Furthermore, Plaintiffs point to then-Police Commissioner Lawrence Mulvaney's refusal to meet with Mr. and Mrs. Knight, in which Mulvaney described Greenaway as "violent" and defended the Nassau Police Officers' conduct. Brewington Decl. Ex. Q. Finally, Plaintiffs allege—citing Defendant Schmitt's testimony in support—that there was no real investigation into the tasing and imprisonment of Greenaway: according to Plaintiffs, the Internal Affairs investigation focused on inappropriate pictures taken by the Nassau Police Officers and not on their imprisonment and tasing of Greenaway. Pl. Reply at 23.

A reasonable fact-finder could decide that Greenaway committed no crime and posed no threat to his own or others' safety. Despite this, the Nassau Police Officers subjected him to multiple taser shots. Therefore, the Court finds that Greenaway's tasing and arrest—while a single incident—may be sufficiently "egregious" or "brutal" to infer deliberate indifference. *See Turpin*, 619 F.2d at 202. However, Plaintiffs allege no specific deficiency in Nassau's training program, and therefore cannot show deliberate indifference by proving a failure to train. *See Green*, 465 F.3d at 81.

Plaintiffs show more evidence of a failure to supervise: they have produced some evidence of a failure to investigate, retrain, or discipline in the wake of a possible egregious or unusually brutal incident. Furthermore, Plaintiffs have produced evidence of a policymaker's (the then-Commissioner's) approval of this incident. *See Gashi*, 2005 WL 195517 at *13. The evidence here of a failure to supervise is considerably less than in *Amnesty America*, 361 F.3d 113, where the police chief himself allegedly witnessed acts of brutality without acting, or in *Vann*, 72 F.3d at 1044-1048, where the police department failed to monitor a police officer who had been the subject of multiple citizen complaints. However, the severity of the incident, the failure to investigate, retrain, or discipline, and the then-Commissioner's approval of the incident provide sufficient indication of a failure to supervise such that summary judgment on this issue is premature. Therefore, the Court DENIES the Nassau Defendants' motion for summary judgment on the question of municipal liability.

Claims against individual municipal employees in their official capacities are "essentially [] claim[s] against the [municipality]." *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) (citations omitted); *see also Hafer v. Melo*, 502 U.S. 21, 25, 27 (1991). Because Plaintiffs sue Nassau, alleging municipal liability, Plaintiffs' claims against the Nassau Police Officers in their official capacities are redundant and are hereby DISMISSED. *See Marcano v. City of Schenectady*, 38 F. Supp. 3d 238, 251 (N.D.N.Y. 2014) (McAvoy, J.).

### VII. Plaintiffs' Negligence Claims Against the Nassau Police Officers Fail.

"[A] plaintiff seeking damages for an injury resulting from a wrongful arrest and detention may not recover under broad general principles of negligence . . . but must proceed by way of the traditional remedies of false arrest and imprisonment." *Secard v. Dep't of Soc. Servs. of Cnty. of Nassau*, 612 N.Y.S. 2d 167, 168 (2d Dep't 1994) (internal quotation marks and

citations omitted) (ellipses in original). Furthermore, intentional acts of assault and battery cannot be negligent. *United Nat'l Ins. Co. v. Tunnel, Inc.*, 988 F.2d 351, 353 (2d Cir. 1993). As such, insofar as Plaintiffs have made claims of negligence, including negligent infliction of emotional distress, against the Nassau police officers for their confinement and tasing of Greenaway, those claims must fail, as Plaintiffs have alleged intentional acts constituting false imprisonment, assault, and battery under New York State law. Therefore, the Nassau Defendants' summary judgment motion on Plaintiffs' negligence claims against the Nassau Police Officers, including negligent infliction of emotional distress, is hereby GRANTED.

### VIII. Plaintiffs' Claims for Intentional Infliction of Emotional Distress Fail.

Intentional infliction of emotional distress has four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Holwell v. N.Y. Post Co., Inc.*, 612 N.E.2d 699, 702 (N.Y. 1993). The "extreme and outrageous conduct" must "go beyond all possible bounds of decency" and be "atrocious, and utterly intolerable in a civilized community." *Id.* (internal citations and quotation marks omitted).

Here, the Court will not decide, as a matter of law, that the multiple tasing of Greenaway was not "extreme and outrageous conduct." Nor can the Court decide, on the facts presented, that the Nassau Police Officers did not disregard a substantial probability of causing Greenaway or his parents severe emotional distress by tasing him multiple times. However, Plaintiffs do not meet the strict requirements for the tort of intentional infliction of emotional distress on the fourth element. "The plaintiff is required to establish that severe emotional distress was suffered, which must be supported by medical evidence, not the mere recitation of speculative claims." *Walentas v. Johnes*, 6 83 N.Y.S.2d 56, 58 (1st Dep't 1999) (internal citations omitted). While

21

Plaintiffs state that Greenaway has seen a mental health professional for his anxiety after the tasing, Plaintiffs do not elaborate on this further, or provide testimony or documentation that this anxiety is "severe." Pl. Counter-Statement at ¶ 213. Nor do Plaintiffs provide more than conclusory statements and a claim that Mr. Knight missed days of work to support the idea that Mr. or Mrs. Knight suffered "severe" emotional distress because of the Nassau Police Officers' actions. *See, e.g., Ishay v. City of New York*, 96-CV-5829, 2000 WL 1140347, at *6 (E.D.N.Y. Aug. 8, 2000) (Block, J.) (granting summary judgment for defendant where plaintiff did not provide concrete examples or medical evidence). Thus, the Nassau Defendants' motion for summary judgment on the intentional infliction of emotional distress claim is hereby GRANTED.

## IX. The Nassau Police Officers do not have Qualified Immunity.

The Nassau Police Officers' claim of qualified immunity relies on their argument that there was reasonable basis to confine and tase Greenaway. SJ Motion at 22. A government official has qualified immunity "if his conduct did not violate clearly established rights or if it would have been objectively reasonable for the official to believe his conduct did not violate plaintiff's rights." *Harris v. O'Hare*, 770 F.3d 224, 239 (2d Cir. 2014) (internal quotation marks and citations omitted). Courts evaluating qualified immunity engage in a "two-pronged inquiry. The first prong asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right. The second prong of the qualified-immunity analysis asks whether the right in question was clearly established at the time of the violation." *Garcia*, 43 F. Supp. 3d at 289. (internal quotation marks and citations omitted).

Here, the Nassau Police Officers' conduct constituted false imprisonment and excessive force, and thus violated a federal right, if Greenaway posed no immediate threat to himself, the

officers, or any bystander. As discussed in Sections II and IV above, there are significant factual disputes about whether Greenaway was a threat to anyone. In *Garcia*, 43 F. Supp. 3d at 289-95, the Southern District of New York found no qualified immunity on the first prong of the inquiry where the defendant officer tased someone engaged in non-criminal conduct and where a reasonable fact-finder could have found that the tased person was not a danger to others or actively resisting arrest. If the fact-finder had so found, then the tasing would be a violation of the Fourth Amendment. *Id.* at 295. Similarly, the Court here finds that, since a reasonable fact-finder could decide that the Nassau police officers' conduct amounted to a violation of the Fourth Amendment, there is no qualified immunity on the first prong.

With respect to the second prong, the Court finds that tasing a non-violent mentally ill person engaged in non-criminal conduct violated a federal right that was clearly established on April 25, 2010. *See Garcia*, 43 F.Supp.3d at 296-298(collecting cases and finding that using a taser in either dart or stun mode on a non-resisting individual who was not suspected of a crime violated rights clearly established as of March 10, 2010); *see also Tracy v. Freshwater*, 623 F.3d 90, 98-100 (2d Cir. 2010) (finding no qualified immunity for a 2000 incident where an officer pepper sprayed an individual in the face who posed no immediate threat). Since a reasonable fact-finder could find that Greenaway was not actively resisting arrest, the record here precludes qualified immunity for the Nassau police officers. *See, e.g., Tolan v. Cotton*, 134 S.Ct 1861, 1866 (2014) (noting that courts evaluating qualified immunity must "draw[] inferences in favor of the nonmovant, even when . . . a court decides only the clearly-established prong of the standard" and must "take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions.") (internal citations omitted).

Therefore, the Nassau Defendants' motion for summary judgment that the Nassau police officers have qualified immunity is hereby DENIED.

## CONCLUSION

Accordingly, on the basis of the record and law as set forth above, the Court hereby DENIES the Nassau Defendants' summary judgment motion on false imprisonment under the Fourth Amendment and New York State law, trespass, excessive force under the Fourth Amendment, assault and battery, municipal liability, and qualified immunity. The Court hereby GRANTS the Nassau Defendants' summary judgment motion on substantive due process, negligence, and intentional infliction of emotional distress.

**SO ORDERED.**

HON. WILLIAM F. KUNTZ, II
United States District Judge

Dated: Ma 31, 2015
Brooklyn, New York