UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- x

SHUAY'B GREENAWAY, SHARON KNIGHT, and
AVERY KNIGHT,

                              Plaintiffs,

                  -against-

COUNTY OF NASSAU, NASSAU COUNTY POLICE
OFFICERS SGT. VINCENT PAPA, in his individual and
official capacities, P.O. RONALD SCHMITT, in his
individual and official capacities, P.O. CLARENCE
HUDSON, in his individual and official capacities, and
P.O. WILLIAM STIO, in his individual and official
capacities, INCORPORATED VILLAGE OF
HEMPSTEAD, and VILLAGE OF HEMPSTEAD POLICE
OFFICERS P.O. FRANE READO, in his individual and
official capacities, and P.O. WALTER OHR, in his
individual and official capacities,

                             Defendants.

**MEMORANDUM AND ORDER**

11-CV-02024 (LDH) (AKT)

------------------------------------------------------------------x

LᴀSHANN DᴇARCY HALL, United States District Judge:

       Plaintiffs Shuay'b Greenaway, Sharon Knight, and Avery Knight brought this action

against Defendants Incorporated Village of Hempstead and Village of Hempstead Police

Officers Frane Reado and Walter Ohr, (collectively, "Village Defendants") as well as Defendants

County of Nassau and Nassau County Police Officers Vincent Papa, Ronald Schmitt, Clarence

Hudson and William Stio, (collectively, "County Defendants"), alleging violations of 42 U.S.C.

§ 1983 and New York state law.  Specifically, Plaintiffs alleged assault, battery, excessive force,

false imprisonment, failure to intervene, gross negligence, abuse of process, and trespass in

violation of the Fourteenth Amendment as well as corresponding state law, intentional and

negligent infliction of emotional distress, municipal liability, and punitive damages.

The Court held a jury trial commencing on May 15, 2017.  Upon a motion by Village Defendants, at the close of evidence, the Court dismissed Mr. Greenaway's claims of gross negligence and intentional infliction of emotional distress against Village of Hempstead Police Officer ("Village Officer") Ohr.  The following claims were submitted to the jury:  false imprisonment, excessive force, unlawful entry/trespass, failure to intervene, municipal liability, gross negligence, and intentional infliction of emotional distress.  (Ct. Ex. 1, ECF No. 131.)  On May 22, 2017, the jury returned a verdict finding as follows:  (1) Nassau County Police Officers ("County Officers") Papa, Schmitt, Hudson, Stio, and the County of Nassau (the "County") liable on Plaintiff Greenaway's claim for false imprisonment, fixing damages against the County at $100,000; (2) County Officers Hudson, Stio, and the County liable on Plaintiff Greenaway's claim of excessive force, fixing damages against the County at $7,500,000; (3) Village Officer Ohr and the Incorporated Village of Hempstead (the "Village") liable on Mrs. Knight and Mr. Knight's claims for excessive force fixing damages against the Village at $50,000 and $35,000, respectively; (4) all officers, the County, and the Village liable on Mr. Greenaway, Mrs. Knight, and Mr. Knight's unlawful entry/trespass claims, fixing damages against the County and Village at $100,000; (5) all officers liable on Mr. Greenaway, Mrs. Knight, and Mr. Knight's failure to intervene claims, fixing damages evenly against the individual officers at $120,000, $50,000, and $30,000, respectively; (6) Village Officer Ohr liable on Mrs. Knight and Mr. Knight's claims for gross negligence, fixing damages against Village Officer Ohr at $50,000 and $35,000, respectively; (7) County Officers Hudson and Stio liable for punitive damages to Mr. Greenaway, fixing damages against the individual officers at $100,000 each; and (8) Village Officer Ohr liable for punitive damages to Mrs. Knight, fixing damages against Village Officer

Ohr for $50,000. (*See generally id.*) On July 12, 2017, this Court entered judgment consistent with the jury's findings. (*See* J., ECF No. 141.)

Village Defendants move, pursuant to Federal Rule of Civil Procedure ("Rule") 50(b), for judgment as a matter of law, or in the alternative, a reduction of the jury's awards pursuant to Rule 59(e). (Mot. J. Matter of Law, ECF No. 140.) County Defendants move for judgment as a matter of law, pursuant to Rule 50(b), or in the alternative, a new trial, pursuant to Rule 59(a), or remittitur, pursuant to Rule 59(e). (Mot. Set Aside J., ECF No. 142.)

## BACKGROUND[1]

In the months preceding April 2010, Mr. Greenaway, at the time a thirty-two year old father of one, had previously been diagnosed with and was undergoing treatment for bipolar disorder and schizophrenia. (Tr. 27–28, 530, 778-84, 862–64, 887, ECF No. 150-2, Ex. 2–7.)[2] Mr. Greenaway's therapist testified that he was making consistent progress, intensely working towards recovery, developing goals, verbalizing himself emotionally, and challenging his core beliefs system. (Tr. 782–83.) During this time, Mr. Greenaway resided with his parents at 218 Amherst Street in Hempstead, New York. (Tr. 29.) Mrs. Knight, Mr. Greenaway's mother, is a retired district manager for the Social Security Administration. (Tr. 26–27.) Mr. Knight, Mr. Greenaway's stepfather, formerly worked for the state of New York as a disability analyst. (Tr. 586, 660.) Together, the Knights owned their residence located at 218 Amherst Street and a nearby rental property located at 221 Amherst Street. (Tr. 28, 584.)

On April 25, 2010, Mr. Greenaway had planned to move from his parents' home to the rental property. (Tr. 29.) By this date, Mrs. Knight had grown concerned that Mr. Greenaway may have stopped taking his medication. (Tr. 30–33, 68–69.) At some point that day, Mr.

---

[1] The facts are taken from documents and testimonial evidence adduced at trial.
[2] Citations to "Tr." refer to the transcript of trial.

Greenaway left his parents' home and Mrs. Knight was uncertain of his whereabouts. (Tr. 33.) Mrs. Knight shared her concerns about Mr. Greenaway's mental status with Mr. Knight, who subsequently drove around the Village of Hempstead searching for Mr. Greenaway. (Tr. 587.) While driving, Mr. Knight happened upon Village Officer Lonnie Johnson. (*Id.*) Mr. Knight asked Village Officer Johnson to either assist in his effort to locate Mr. Greenaway or "be on the lookout" for his son because, as he indicated to Village Officer Johnson, Mr. Greenaway was decompensating. (Tr. 587–88.) When Village Officer Johnson asked what "decompensating" meant, Mr. Knight testified that he left to continue his search alone believing that nothing "fruitful" would come from further interaction with Village Officer Johnson. (Tr. 595.)

While Mr. Knight was searching for Mr. Greenaway, Mrs. Knight spoke with Mr. Cleaster Brooks, the Knights' tenant of five years. (Tr. 34–35, 88–89.) Mr. Brooks informed Mrs. Knight that he and Mr. Greenaway had just had a "pushing match" and suggested to Mrs. Knight that Mr. Greenaway go to the hospital. (Tr. 34, 69, 89–91.) After hearing about the pushing match, Mrs. Knight grew increasingly concerned and called 911 seeking assistance in taking Mr. Greenaway to the hospital. (Tr. 34–35.) Mrs. Knight informed the 911 operator that Mr. Greenaway suffered from bipolar disorder and he was not "that violent." (Tr. 35.) At some point, Mr. Knight received a phone call informing him that Mr. Greenaway was at home. (Tr. 595.) Mrs. Knight then went across the street to join her husband, who had since arrived at the 221 Amherst Street home. (Tr. 35.)

At the 221 Amherst Street residence, Mr. Greenaway was found in the bathroom adjacent to the master bedroom where he was alone and painting the walls. Mr. Knight encouraged Mr. Greenaway to go to the hospital. (Tr. 35–36, 625, 868–69.) In response, Mr. Greenaway "very calm[ly]" stated that he was painting at the moment and did not want to go to the hospital.

(Tr. 36, 70, 625–26.)  A similar exchange took place between Mr. Greenaway and Mrs. Knight. To Mrs. Knight, however, Mr. Greenaway indicated that he would prefer to go to the hospital the following day.  (Tr. 36–37, 70, 103–04.)  Mrs. Knight then went downstairs to see if assistance had arrived.  (Tr. 37.)

When Mrs. Knight arrived downstairs, she noticed two Village police cars pulling up to the rental property.  (Tr. 37.)  Mrs. Knight then escorted two officers (identified at trial as Village Officers and Johnson) upstairs to assist with getting her son to go to the hospital.  (Tr. 37–38, 644.)  When they arrived at the master bedroom, Mr. Greenaway was still in the bathroom painting.  (Tr. 150.)  At this time, Village Officer Reado asked Mr. Greenaway a number of questions and suggested that they go to the hospital together.  (Tr. 38, 643, 869, 925.) Mr. Greenaway continued to paint and expressed that he did not want to go to the hospital at that time.  (Tr. 39.)  During the conversation, Mr. Greenaway provided Village Officer Reado with his drivers' license, which indicated that he resided at the 221 Amherst Street home.  (Tr. 39, 603, 629–30, 869–70.)  Mr. Greenaway asked Village Officer Reado if he was under arrest or had any outstanding tickets; Village Officer Reado responded, "no."  (Tr. 39, 604, 629–30, 644, 869–71.)  Nonetheless, Village Officer Reado remained "persistent" that Mr. Greenaway go to the hospital.  (Tr. 869–70.)  Mr. Greenaway then asked Village Officer Reado to leave his home—and indicated that he was fine.  (Tr. 39, 62, 630, 644, 870–71.)  Throughout this exchange, Mr. Greenaway maintained a calm demeanor and continued to paint.  (Tr. 39, 602, 871.)  Mrs. Knight testified that she did not want Village Officer Reado to leave at this time because she felt that he was doing a good job engaging her son.  (Tr. 103.)  Village Officer Reado's conversation with Mr. Greenaway lasted at least fifteen to twenty minutes.[3]  (Tr. 175.)

---

[3] At trial, Village Officer Reado was confronted with his sworn deposition testimony, in which he stated that he was with Mr. Greenaway for forty minutes before he became a "danger."  (Tr. 176.)

Additional officers from the County and Village, some of whom were members of the County's emergency special unit, subsequently arrived at the scene. Mr. Knight testified that once the additional officers arrived, there was a "change." (Tr. 49, 101, 605, 607.) According to Mr. Knight, the "attitude" in the room became confrontational and aggressive as Village and County Officers began to crowd Mr. Greenaway. (Tr. 605, 607.) Mr. Knight asked the police officers to leave his home two or three times. (Tr. 611–12.) Village Officer Ohr told Mr. Knight, "You got to get the fuck out of here. We need you the fuck out of here." (Tr. 605, 656.) Mrs. Knight heard Village Officer Johnson say, "Fuck this shit. This is enough." (Tr. 49, 103.) As she heard that statement, she stepped out of the bathroom and saw County Officer Hudson crouched down with what she believed was a gun.[4] (Tr. 49, 76–78.) When she questioned County Officer Hudson about the "gun," Village Officer Ohr began to shove her forcibly out of the master bedroom. (Tr. 49–50.) Next, Village Officer Ohr took Mrs. Knight's phone and threw it out of the bedroom. (Tr. 50.) He then pushed Mrs. Knight out of the bedroom door causing her to land on her back. (Tr. 50.) Shortly thereafter, Village Officer Ohr began to shove Mr. Knight out of the master bedroom as well. (Tr. 608.) Mr. Knight, who was trying to stay close to his son, clung to the doorframe, but after a minute or two, was forced out into the hallway by Village Officer Ohr. (Tr. 51–52, 608–09, 619–20, 658.) The bedroom door slammed shut and Mr. Knight heard the deadbolt lock. (Tr. 52–53, 105, 609–10.) Mr. Knight began to bang on the door and yell, among other things, for the police officers to leave his home. (Tr. 62–63, 105, 610–11.)

Inside the master bathroom, Mr. Greenaway continued to paint. He testified that he then noticed Village Officer Reado look back and step to the side. (Tr. 872–73.) Village Officer

---

[4] At trial, County Officer Hudson testified that he was carrying a Taser. (Tr. 305–06.)

Reado then gave a command for an officer to tase Mr. Greenaway. (Tr. 182–83, 243.) Without warning, Mr. Greenaway was shot with the Taser by County Officer Hudson. (316, 872–73.) County Officers Hudson and Stio testified that at the time the Taser was first deployed, Mr. Greenaway was not threatening any officer. (Tr. 319, 720.) County Officer Stio, who also shot Mr. Greenaway with a Taser, testified that he did not deem Mr. Greenaway a danger to himself. (Tr. 769–70.) In total, Mr. Greenaway was shot with a Taser four times. (Tr. 185, 613, 872–73.) Throughout the ordeal, Mr. and Mrs. Knight could hear the electrical popping noises of the Taser as it was discharged and the simultaneous screams from their son. (Tr. 53–54, 80–81, 612–13.) Mr. Greenaway too could hear his parents screaming in the hallway. (Tr. 873–74.) Minutes later, Mr. Greenaway was carried out of his home on a gurney; he was naked, covered in white paint, and had a sheet strewn across his body. (Tr. 54–57, 615.) As Mr. Greenaway was carried out of the home, Mr. Knight observed that Mr. Greenaway was semi-conscious. (Tr. 615.) Mrs. Knight, however, feared that Mr. Greenaway was dead. (Tr. 54–57.)

Mr. Greenaway was taken to the hospital, where he remained for almost two weeks. (Tr. 61, 882.)

## STANDARD OF REVIEW

### I. Rule 50(b) Motions

During trial, before the case is submitted to the jury, a party with reason to believe that "a reasonable jury would not have a legally sufficient evidentiary basis" to find for its adversary on a particular issue, may move for judgment as a matter of law pursuant to Rule 50(a). Fed. R. Civ. P. 50(a). After trial, a party may renew its motion on the previously raised issue pursuant to Rule 50(b) seeking a new trial or judgment as a matter of law. Fed. R. Civ. P. 50(b).

A party moving pursuant to Rule 50(b) "faces a high bar," *Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 479 (2d Cir. 2001), because "'the jury has deliberated in the case and actually returned its verdict' in favor of the non-movant," *Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005)).  In reviewing a Rule 50(b) motion, the Court "must draw all reasonable inferences in favor of the nonmoving party, may not make credibility determinations or weigh the evidence, and must disregard all evidence favorable to the moving party that the jury is not required to believe." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 274 (2d Cir. 2016) (quoting *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (internal quotation marks omitted)).  A Rule 50(b) motion should not be granted unless there is such (1) "a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture," or (2) "an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]."  *Advance Pharm., Inc. v. U.S.*, 391 F.3d 377, 390 (2d Cir. 2004) (citing *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998)).

## II.    Rule 59 Motions

Pursuant to Rule 59(a), a district court may grant a motion for a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  Essentially, to grant a Rule 59 motion, a district court "must conclude that the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice, *i.e.*, it must view the jury's verdict as against the weight of the evidence."  *Maureen Christensen v. Cty. of Dutchess, N.Y.*, 548 F. App'x 651, 653 (2d Cir. 2013) (summary order) (quoting *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003)).

In contrast to a Rule 50 motion for a new trial, a Rule 59(a) motion for a new trial "may be granted even if there is substantial evidence supporting the jury's verdict." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998). The trial judge does not have to view the evidence in the light most favorable to the non-moving party; indeed, she is permitted to weigh the evidence herself. *Id.* However, "precedent counsels that trial judges must exercise their ability to weigh credibility with caution and great restraint." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012). A district court should "rarely disturb a jury's evaluation of a witness's credibility" and grant the motion only "when the jury's verdict is 'egregious.'" *DLC Mgmt. Corp.*, 163 F.3d at 134 (quoting *Dunlap–McCuller v. Riese Org.*, 980 F.2d 153, 158 (2d Cir. 1992)).

In addition, pursuant to Rule 59(e), a district court may "alter or amend a judgment" submitted following a jury trial. Fed. R. Civ. P. 59(e). The decision to alter or amend a judgment rests within "the sound discretion of the district judge." *McCarthy v. Manson*, 714 F.2d 234, 237 (2d Cir. 1983).

## DISCUSSION

### I. Village Defendants

#### A. Village Defendants' Failure to Preserve Arguments Constitutes Waiver.

##### 1. *Plaintiff Greenaway's Claim for Failure to Intervene against Defendant Village Officer Ohr*

Village Defendants ask the Court to dismiss Plaintiff Greenaway's failure to intervene claim as to Village Officer Ohr. According to Village Defendants, the evidence presented at trial demonstrated that Village Officer Ohr: (1) "did not have a realistic opportunity to intervene and prevent County Officers from using a Taser upon Plaintiff Greenaway" and (2) "did not know that Plaintiff Greenaway's constitutional rights were being violated." (Mem. Supp. Village

Defs.' Mot. J. Matter of Law ("Village Defs.' Br.") at 12, ECF No. 140-2.) Plaintiffs counter that the Court need not reach the merits of these arguments because Village Defendants waived them as a matter of law. (Pls.' Resp. Opp. Village Defs.' Mot. J. Matter of Law ("Pls.' Opp. Village Br.") at 3–4, ECF No. 150.) The Court agrees.

It is well settled that Rule 50(b) relief is available only if a party "sought such relief before the jury retired to deliberate under Fed. R. Civ. P. 50(a)(2), and limits the permissible scope of the later motion to those grounds specifically raised in the prior motion for [judgment as a matter of law]." *Provost v. City of Newburgh*, 262 F.3d 146, 161 (2d Cir. 2001) (internal quotation marks omitted); *see also Conte v. Cty. of Nassau*, No. 06-CV-4746, 2017 WL 837691, at *6 (E.D.N.Y. Mar. 3, 2017) ("Once a case has been submitted to the jury, a motion for [judgment as a matter of law] 'may be renewed only on grounds that were specifically articulated before submission of the case to the jury.'") (quoting *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 164 (2d Cir. 1998)). Rule 50(a) does not set out how specific a motion must be. However, "the purpose of requiring the moving party to articulate the ground on which [the motion] is sought is to give the other party an opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury." *Galdieri-Ambrosini*, 136 F.3d at 286 (quoting *Baskin v. Hawley*, 807 F.2d 1120, 1134 (2d Cir. 1986) (internal quotation marks omitted)). Thus, a motion for judgment as a matter of law "must at least identify the specific element that the defendant contends is insufficiently supported." *Id.*

At trial, the only Rule 50 motion made by Village Defendants that could conceivably capture the failure to intervene claim—as it was made to dismiss the case in its entirety—was articulated as follows:

> At this time[,] the [V]illage [D]efendants move pursuant to Rule 50 to dismiss the plaintiffs' complaint in its entirety on the grounds of qualified immunity, that based

> upon the evidence that was elicited during the trial of the action of the Hempstead
> Police Officers were objectively reasonable under the circumstances.

(Tr. 1017.)  Nothing about this motion could have put Plaintiffs on notice that Village

Defendants were moving to dismiss the failure to intervene claim for lack of evidence.  The

motion was made on the grounds of qualified immunity.  As Village Defendants are assuredly

aware, the application of qualified immunity necessarily presumes the underlying conduct.  It

says in essence that although an officer may have engaged in wrongful conduct, he is shielded

from liability nonetheless.  It is, therefore, inconceivable that by arguing for qualified immunity

on behalf of Village Officer Ohr, Plaintiffs would be put on notice that Village Defendants were

challenging the sufficiency of the evidence for the underlying charge of failure to intervene—let

alone any specific element necessary to prove that claim.

Village Defendants correctly point out that they can potentially overcome this deficiency

because waiver can be excused to prevent manifest injustice.  *See, e.g.*, *Cruz v. Local Union No.

3 of Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1155 (2d Cir. 1994) ("Thus, if an issue is not

raised in a previous motion for a directed verdict, a Rule 50(b) motion should not be granted

unless it is 'required to prevent manifest injustice.'" (quoting *Baskin*, 807 F.2d at 1134)).

"Manifest injustice exists where a jury's verdict is wholly without legal support."  *ING Glob. v.

United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014).  As evidence of

purported manifest injustice, Village Defendants offer only that the "trial was devoid of any

evidence" to support the claim against Village Officer Ohr.  (Village Defs.' Reply Br. at 2–3,

ECF No. 154-1.)  Or, put differently, Village Defendants maintain that had they made their

motion they would have prevailed.  This is not manifest injustice.  Instead, Village Defendants'

argument amounts to nothing more than an improper procedural workaround for a patently

untimely motion.  Even if, as Village Defendants suggest, they would have prevailed on a timely

motion, it cannot overcome the requirements read into Rule 50. *See, e.g.*, *Mealey v. Apartment Rentals*, 125 F.3d 844 (2d Cir. 1997) ("The Mealeys do not argue here that a 'manifest injustice' occurred when the district court allowed the jury verdict to stand. Instead, they argue only that they have met the standard necessary to obtain the entry of a judgment in their favor as a matter of law. While this may have entitled them to relief in the trial court if they had made a timely motion, it does not afford a basis for reversing the denial of an untimely motion. On the contrary, the Mealeys can prevail here only by meeting the high threshold suggested above."). Accordingly, Village Defendants' motion with respect to Plaintiff Greenaway's failure to intervene claim against Village Officer Ohr is denied.

2.    *Plaintiff Sharon Knight's Punitive Damages Award against Defendant Village Officer Ohr*

Village Defendants' motion with respect to Mrs. Knight's award of punitive damages suffers from the same flaw. In the instant motion, Village Defendants argue that Mrs. Knight's punitive damages award should be overturned because the evidence presented at trial failed to show that Village Officer Ohr's conduct was performed with "evil intent" or "conscious wrongdoing." (Village Defs.' Br. at 23.) Neither of these arguments was raised at trial.

On reply, Village Defendants argue alternatively that even if they failed to preserve the argument under Rule 50, they are entitled to remittitur pursuant to Rule 59(e). (Village Defs.' Reply Br. at 7.) The Court disagrees. Although Rule 59(e) permits a court to alter or amend a judgment, it is not a mechanism "to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 486 n. 5 (2008); *see also U.S. v. Painting known as Le Marche*, No. 06-CV-12994, 2010 WL 2229159, at *3 (S.D.N.Y. May 25, 2010) ("Claimant, however, cites no case in which a court denied a Rule 50(b) motion for [judgment as a matter of law] and granted the same relief under a Rule 59(e)

motion, and the Court has found none.  Unsurprisingly, courts are unwilling to let parties

circumvent Rule 50(b)'s requirements for obtaining [judgment as a matter of law] after a jury

trial by simply invoking Rule 59(e) instead."), *aff'd sub nom. U.S. v. Davis*, 648 F.3d 84 (2d Cir.

2011).  Instead, "the primary grounds for granting a Rule 59(e) motion to alter or amend are 'an

intervening change of controlling law, the availability of new evidence, or the need to correct a

clear error or prevent manifest injustice.'" *Densberger v. United Techs. Corp.*, 125 F. Supp. 2d

585, 597 (D. Conn. 2000) (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d

1245, 1255 (2d Cir.1992), *aff'd,* 297 F.3d 66 (2d Cir. 2002).

Here, Village Defendants make no effort to make such a showing—none.  Instead, they

seemingly ignore the entry fee to a Rule 59(e) motion and dedicate the entirety of their argument

to setting out why the damages award was excessive.  Without some showing that there has been

a change in law, new evidence, resulting manifest injustice, or other legitimate basis, the Court

will not entertain Village Defendants' Rule 59(e) motion on this claim.  Accordingly, Village

Defendants' motions with respect to Mrs. Knight's award of punitive damages against Village

Officer Ohr are denied.[5]

### 3.     *Defendant Village Officers Ohr and Reado's Entitlement to Qualified Immunity*

Unlike the above claims, Village Defendants made a timely Rule 50(a) motion on the

grounds of qualified immunity.  (Tr. 1017.)  Specifically, Village Defendants maintained at trial

that Plaintiffs' complaint should be dismissed in its entirety because "based upon the evidence

---

[5] By their motion, Village Defendants also seek, pursuant to Rule 59, remittance on Plaintiffs Sharon and Avery Knight's awards for the gross negligence claim against Village Officer Ohr as well as the failure to intervene claims against Village Officers Ohr and Reado.  Plaintiffs have since conceded the argument and by agreement of the parties, the damages of these claims are reduced to zero.  (Korenbaum Decl. ¶¶ 4–7, ECF No. 150-1.)  The Court, however, will not vacate the findings of liability on these claims, as these Rule 50 motions were not properly preserved.

that was elicited during the trial of the action of the Hempstead Police Officers were objectively reasonable under the circumstances." (Tr. 1017.)  The Court reminds Village Defendants that to proceed on a post-trial Rule 50 motion, the motion at trial, "must at least identify the specific element that the defendant contends is insufficiently supported." *Galdieri-Ambrosini*, 136 F.3d at 286.  Village Defendants' trial motion failed to do so.

Under law, a police officer is entitled to qualified immunity if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  In assessing whether an officer is entitled to qualified immunity a court must consider:  "(1) whether plaintiff has shown facts making out [a] violation of a constitutional right; (2) if so, whether that right was 'clearly established'; and (3) even if the right was 'clearly established,' whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful." *Id.* (quoting *Taravella v. Town of Wolcott*, 599 F.3d 129, 133–34 (2d Cir. 2010)).

Here, Village Defendants argue that a grant of their Rule 50 motion is warranted because: "Plaintiffs did not have a clearly established constitutional right to have the Officers withdraw and leave their premises in the midst of a police operation that became tense, unpredictable and dangerous" and "the Knights did not have clearly established constitutional rights to remain in the room under the circumstances." (Village Defs.' Br. at 24.)  These arguments go to the second prong of the qualified immunity analysis—whether a law was clearly established at the time of the alleged wrongdoing.  By contrast, the motion made at trial would have put Plaintiffs on notice that Village Defendants challenged only the sufficiency of evidence as to the third prong of the qualified immunity analysis—the reasonableness of Village Defendants' conduct.

In other words, Village Defendants did not properly preserve the current articulation of their qualified immunity motion. It is, therefore, waived. Village Defendants' motion with respect to Village Officers Ohr and Reado's qualified immunity defense is denied.

      B.    <u>Plaintiffs' Claim for Municipal Liability against Defendant Village Was Supported By Sufficient Evidence</u>.

Village Defendants also ask the Court to vacate the jury verdict finding of municipal liability against the Village. Specifically, Village Defendants contend, "there was absolutely no proof to establish the three prongs of the 'deliberate indifference' standard." (*Id.* at 22.) Here again, the Court disagrees.

Municipal liability is available "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts [a plaintiff's] injury." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see also Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."). When proceeding under a failure-to-train theory, plaintiffs must prove that "the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007). Deliberate indifference is shown where three factors are met:

> [i] a policymaker knows "to a moral certainty" that city employees will confront a particular situation; [ii] the situation either presents the employee with "a difficult choice of the sort that training or supervision will make less difficult" or "there is a history of employees mishandling the situation;" and [3] [sic] "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.

*Id.* at 195–96 (quoting *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir.1992)); *see also Houston v. Cotter*, No. 07-CV-3256, 2016 WL 1253391, at *8–9 (E.D.N.Y. Mar. 30, 2016) ("[G]iven the trial evidence, the jury could have certainly found that the defendant Suffolk County was deliberately indifferent by failing to adequately train or supervise its officers b[y] allowing them to make the ultimate decision as to whether an inmate should remain on suicide watch.").

At trial, Plaintiffs proffered evidence sufficient for a jury to find the requisite deliberate indifference with respect to the false imprisonment and excessive force claims. *First*, the County established a special unit designed specially to address encounters with emotionally disturbed persons. (Tr. 199, 229, 688.) As was the case here, Village Officers worked in tandem with that unit. Certainly, this could lead a reasonable juror to conclude that the Village "knew to a moral certainty" that its employees would confront emotionally disturbed persons in the course of their employment. *Second*, it seems plainly obvious that an encounter with an emotionally disturbed person would present choices of the sort that training would make less difficult. The obviousness of this fact might explain why Village Defendants' motion fails to address this prong with any specificity. In any event, a number of choices officers may face in these circumstances come readily to mind. For instance, can the emotionally disturbed person be lawfully confined against his or her express wishes? Is it okay to use or order the use of a Taser on that person as a means to effectuate his or her confinement? Undoubtedly, training would assist an officer in making the choice whether to involuntarily confine someone. It may inform

him that in making this choice, involuntary confinement is permitted only when a "person who appears to be mentally ill [ ] is conducting himself or herself in a manner which is likely to result in serious harm to the person or others."[6] *See* N.Y. Mental Hyg. Law § 9.41 (McKinney). Training would also assist an officer in deciding whether to use or order the use of force to involuntarily confine someone; particularly where the confinement in the first instance may not be lawful. *Third*, there can be no genuine question that making the wrong choice in these situations would frequently lead to the deprivation of a constitutional right. Should someone be wrongfully tased—they have been unlawfully seized in violation of the Fourth Amendment of our Constitution. *See, e.g.*, *Edrei v. City of New York*, 254 F. Supp. 3d 565, 573 (S.D.N.Y. 2017) ("A person has been 'seized' within the meaning of the Fourth Amendment when an 'officer, by means of physical force or show of authority, . . . in some way restrain[s] the liberty of a citizen.'"); *see also Jackson v. City of New York*, 939 F. Supp. 2d 235, 248 (E.D.N.Y. 2013) (denying defendants' summary judgment motion where evidence established that defendants lacked reasonable suspicion to detain plaintiff). Should someone engage in the use of excessive force, they act in violation of the Fourteenth Amendment of our Constitution. *See Hemphill v. Schott*, 141 F.3d 412, 418 (2d Cir. 1998) ("This court has held that outside the context of an arrest, a plaintiff may make claims of excessive force under § 1983 under the Due Process Clause of the Fourteenth Amendment."). Deliberate indifference was sufficiently established. Village Defendants' motion is denied.

---

[6] It should not go without mention that the Officers testified to varying standards of the Mental Health Hygiene Law. Village Officer Reado testified that, at the moment an individual "appears to be a danger to himself and others," the decision to go to the hospital is no longer up to the individual; at that point, he has an "obligation to make sure [the individual] gets to the hospital and to get reevaluated." (Tr. 199.) County Officer Hudson testified that officers may involuntarily confine someone either "if [the officers] determine that they might be a danger to themselves or to others" or "if [the individual is] on medication and [is] noncompliant." (Tr. 348.) County Officer Stio testified that, per his training, he could involuntarily confine a person "in need of medical treatment." (Tr. 761–62.)

## II.  County Defendants

A.  <u>County Defendants' Failure to Preserve Arguments Constitutes Waiver</u>.

As with Village Defendants, County Defendants move pursuant to Rule 50 to dismiss certain of Plaintiffs' claims.  In particular, County Defendants move for judgment as a matter of law on the following claims:  (1) false imprisonment claim on the grounds that several Officers testified to circumstances that form bases for probable cause, (County Defs.' Mem. Supp. Mot. Set Aside J. ("County Defs.' Br."), at 18–20, ECF No. 142-1.); (2) excessive force claim on the grounds that the use of the Taser was reasonable, as "the least amount of physical force to seize Greenaway," (County Defs.' Br. at 23.); (3) unlawful entry/trespass claim on the grounds that exigent circumstances justified the Officers remaining in the home, (County Defs.' Br. at 30.); and (4) punitive damages on the grounds that County Officers Hudson and Stio did not violate any constitutional right of Mr. Greenaway, (County Defs.' Br. at 32.).  None of these arguments were raised by County Defendants at trial.

At trial, County Defendants made the following Rule 50 motion:  "I will make it simple [J]udge, in that I join in the Village's application on the Rule 50 application in all respects and as to all charges, a reasonable jury could not find the facts according to the law."  (Tr. 1031.) County Defendants tethered their Rule 50 application to Village Defendants' application.  Thus, to the extent Village Defendants did not raise an issue neither did County Defendants.  With respect to the excessive force, unlawful entry/trespass, and punitive damages motions, County Defendants are left, therefore, to rely only on the highly unspecific motion made by Village Defendants for dismissal of all claims on qualified immunity grounds.  This motion fails to properly notice Plaintiffs of County Defendants' current arguments on these claims.

Likewise, the trial motion made by Village Defendants on the false imprisonment claim did not properly preserve County Defendants' current motion. Village Defendants stated: "Your Honor, at this time we also move to dismiss the false imprisonment claim against the Village of Hempstead Officers. I don't think there's any testimony that has been presented to the [C]ourt or the jury that the Village Officers took Mr. Greenaway into custody." (Tr. 1025.) Nothing about Village Defendants' motion would put Plaintiffs on notice that County Defendants were arguing that purported evidence of probable cause precluded a finding of liability.

Moreover, County Defendants do not press an argument that an exception should apply to prevent manifest injustice—nor could they successfully. Each of County Defendants' Rule 50 arguments were waived and their motion is denied. *See Cruz*, 34 F.3d 1148 at 1155 ("Thus, if an issue is not raised in a previous motion for a directed verdict, a Rule 50(b) motion should not be granted unless it is 'required to prevent manifest injustice.'").

B. The Jury's Verdict Was Supported by Sufficient Evidence.

    *1. County's Rule 59 Motion for a New Trial*

At trial, Plaintiffs presented the jury with a narrative that was sadly straightforward. Mr. Greenaway suffered from bipolar disorder and schizophrenia. (Tr. 28.) In the months leading up to the April 25, 2010 incident, he had made substantial progress in several respects. (Tr. 782–83.) He was going to school, working, improving interpersonal relationships, and having conversations with his therapist about maintaining balance and self-awareness. (Tr. 781–84.) One day, concerned that Mr. Greenaway may be decompensating, Mrs. Knight called 911 seeking police assistance to transport Mr. Greenaway to the hospital. (Tr. 34–35.) When the police arrived to Mr. Greenaway's home, he was calmly painting the bathroom. (Tr. 39, 150.) For at least fifteen to twenty minutes, Mr. Greenaway calmly engaged the Officers, asked them

to leave his home, and declined to go to the hospital.  (Tr. 39, 175–76, 604, 629–30, 644, 870–71.)  Mr. Knight too asked the Officers to leave the home.  (Tr. 611–12.)  An Officer forcibly removed Mr. and Mrs. Knight from the master bedroom.  (Tr. 49–52, 608–09, 619–20, 658.)  Then, without provocation, Mr. Greenaway was tased four times.  (Tr. 185, 613, 872–73.)  None of the Officers intervened.

All told, the evidence adduced by Plaintiffs at trial, if credited, was sufficient to sustain liability for excessive force, punitive damages, false imprisonment, failure to intervene, and unlawful entry/trespass.  It is clear by the jury's verdict that they indeed credited Plaintiffs' version of events.  Of course, the Court cannot state with any certitude why the jury credited Plaintiffs' version over Defendants' version.  However, at trial the jury was instructed that they were the "sole judges of credibility of the witnesses and the weight [the witness's] testimony deserve[d]." (Tr. 1046.)  In making the decision about whether to believe all or part of a witness' testimony, the jury was further instructed that they were permitted to consider any number of factors, including:  (1) "the witness' opportunity to see, hear and know about the events he or she described"; (2) "the witness' ability to recall and describe those things"; (3) "the witness' manner in testifying[—]was the witness candid and forthright or did the witness seem as if he or she was hiding something, being evasive or suspect in some way"; (4) "how the witness' testimony on direct examination compared with how the witness testified on cross-examination"; (5) "the reasonableness of the witness' testimony in light of all the other evidence in the case"; (6) "whether the witness had any possible bias, any relationship to a party, any motive to testify falsely or any possible interest in the outcome of the trial"; and (7) "whether a witness' testimony was contradicted by his or her other testimony, by what that witness said or did on a prior occasion[,] or by the testimony of other witnesses[,] or by other evidence." (Tr. 1046–47.)

It is possible that against this backdrop, the jury noted evasive responses from some defense witnesses. For instance, on at least three occasions, the Court had to instruct County Officer Schmitt to answer the question posed by counsel, and only the question posed. (Tr. 938–41, 945, 947.) The jury may have observed that at other times, County Officer Schmitt gave answers that were nonresponsive. Plaintiffs' counsel asked County Officer Schmitt the following yes or no question: "You didn't see Mr. Greenaway try and use a roller as a weapon, did you?" (Tr. 954.) County Officer Schmitt responded, "I saw a roller moving around by the doorway." (*Id.*) Only after the Court directed County Officer Schmitt to respond to the question did he answer: "no." (Tr. 954–55.) Perhaps the jury noted contradictions between the testimony offered by defense witnesses and other evidence in the record. For example, police reports prepared in connection with the events of April 25, 2010, indicated that Mr. Greenaway began to reach towards his boot, potentially for a weapon, and that Mr. Greenaway used his paint roller as a weapon. (Pls.' Trial Exs. 21, 30.) These contentions were repeated in the EMS report. (Pls.' Trial Ex. 10.) However, at trial and under oath, County Officer Hudson testified that he did not recall Mr. Greenaway reaching for a weapon; Village Officer Reado, County Officer Schmitt, and County Officer Stio each testified Mr. Greenaway never used the paint roller as a weapon. (Tr. 186, 362–63, 720, 954–55.) Former Ambulance Medical Technician Daniel Arce testified that no weapons were recovered.[7] (Tr. 472–73.) Other defense witnesses likewise testified that Mr. Greenaway was not violent. (Tr. 151, 205, 247, 250, 472, 479–80.) Similarly, when examined by Plaintiffs' counsel, County Officer Stio testified that he neither witnessed Mr. Greenaway do anything toward the Officers when he had paint on his hands nor heard anything Mr. Greenaway said. (Tr. 694–95, 697, 706.) Yet, when examined by the defense, County

---

[7] The Court is unaware whether the police reports, which are readily accessible within the public domain, have ever been corrected such that they are consistent with the sworn testimony given at trial.

Officer Stio testified that Mr. Greenaway was rubbing paint on his genitals and saying "[d]o you want some of this."  (Tr. 741, 769.)  Lastly, perhaps the jury observed that County Officers were impeached, multiple times, by Plaintiffs' counsel when the testimony they offered at trial differed from that given at their deposition.  Notably, at trial County Officer Schmitt testified that he did not see Mr. Greenaway swing the paint roller at County Officer Hudson; however, in his deposition, he testified that Mr. Greenaway swung at County Officer Hudson multiple times.  (Tr. 965–67.)  County Officer Schmitt explained the discrepancy by admitting that his deposition testimony "wasn't true."  (Tr. 967.)  If these were indeed the observations by the jury, they were shared by the Court.

The verdict was not seriously erroneous nor was it a miscarriage of justice.  The Court will not, as County Defendants request, grant a new trial.  *U.S. E. Telecomm., Inc. v. US W. Commc'ns Servs., Inc.*, 38 F.3d 1289, 1301 (2d Cir. 1994) ("In exercising [its] discretion, a trial court may order a new trial when it is convinced that the jury has reached a 'seriously erroneous result' or that the verdict is ... against the weight of the evidence."); *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 370 (2d Cir. 1988) ("The district court ordinarily should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.").

### 2.  County's Rule 59 motion for remittitur

The only question remaining is to what extent, if at all, the Court should remit Plaintiff Greenaway's awards, pursuant to Rule 59, for excessive force, punitive damages, false imprisonment, and unlawful entry/trespass.[8]  Remittitur is the "process by which a court compels

---

[8] The Court remits the jury's awards for failure to intervene as Plaintiffs have conceded the motion.  (Brewington Decl. ¶¶ 3–4, ECF No. 149-3.)  Plaintiffs Greenaway, Sharon Knight, and Avery Knight must remit $80,000.00, $33,333.32, and $20,000.00 respectively on the failure to intervene claim.  The Court, however, leaves the findings of liability intact, as there was sufficient evidence to support the jury's finding.

a plaintiff to choose between reduction of an excessive verdict and a new trial." *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1328 (2d Cir. 1990). A verdict is excessive only if it "is so high as to shock the judicial conscience and constitute a denial of justice." *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990). While this determination is made by examining awards in comparable cases, the district court should not "balance the number of high and low awards and reject the verdict in the instant case if the number of lower awards is greater." *Id.* at 187. Rather, the Court should determine whether the verdict is "within [a] reasonable range." *Id.* In addition, while comparing cases, the district court should consider the unique facts presented at trial. *See Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 684 (2d Cir. 1993) ("In determining whether a particular award is excessive, courts have reviewed awards in other cases involving similar injuries, bearing in mind that any given judgment depends on a unique set of facts and circumstances." (quoting *Nairn v. Nat'l R.R. Passenger Corp.,* 837 F.2d 565, 568 (2d Cir.1988))).

### a.    Excessive Force

The parties agree that the $7.5 million awarded on Mr. Greenaway's excessive force claim is excessive. (County Defs.' Br. at 36–37; Pls.' Resp. Opp. County Defs.' Mot. Set Aside J. ("Pls.' Opp. County Br.") at 20, ECF No. 149.) Indeed, Plaintiffs have already agreed to remit the excessive force award by $2.5 million. County Defendants urge the Court to reduce the award significantly more to $100,000. Neither party has provided the Court with case law particularly useful to the Court's remittitur analysis. County Defendants rely on four cases. Two of the cases were resolved through settlement. Of course, settlement terms are often driven by considerations not before a jury. The other two cases are from other jurisdictions. Not only are those cases not binding on this Court, they also do not speak to what a jury in this circuit may

find. Plaintiffs fare no better having offered the Court only one case that too is from outside of this circuit.

Moreover, in pressing for remittitur County Defendants focus on cases where the plaintiff tragically died and was awarded less than Mr. Greenaway. For this reason, County Defendants argue that any award here should be significantly lower. Certainly, the loss of life is the ultimate loss. However, as crafted, County Defendants' argument largely ignores the loss suffered by Mr. Greenaway attendant to *living* with the consequences of the events of April 25, 2010. Since the incident, Mr. Greenaway testified that he remains fearful and terrified. (Tr. 888.) Mr. Greenaway's therapist testified—that, among other things, Mr. Greenaway suffered additional trauma that manifested in the form of flashbacks, distrust of all people, feeling unsafe, paranoia, depression, and nervousness. (Tr. 788–95.) She further testified that Mr. Greenaway's experience with Village and County Defendants triggered "the opposite" of the growth he achieved prior to April 2010. (Tr. 793.) Mr. Greenaway testified that he never got back on track with either counseling or school. (Tr. 884–85, 920–21.) Mr. Greenaway lost trust for his parents and his siblings, and isolated himself from his family as a result. (Tr. 63–64, 616–17, 882, 887–88.) He no longer trusts the police. (Tr. 882.)

In any event, in the absence of comparable cases upon which the Court can rely, the Court is left to be guided by the principle that courts should endeavor to be the "most faithful to the jury's verdict." *Earl*, 917 F.2d at 1328; *see also Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 671 (2d Cir. 2012) ("In addition, in reviewing damages awards, '[w]e accord considerable deference to the factual findings of both judge and jury.'" (quoting *Blissett v. Coughlin*, 66 F.3d 531, 536 (2d Cir.1995)); *Okraynets v. Metro. Transp. Auth.*, 555 F. Supp. 2d 420, 425–26 (S.D.N.Y. 2008) ("The trial judge, exercising a mature judicial discretion, should

view the verdict in the overall setting of the trial; consider the character of the evidence . . . and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result. The judge's duty is essentially to see that there is no miscarriage of justice." (citing *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir. 1978))). That is, the "calculation of damages is the province of the jury." *Ismail*, 899 F.2d at 186.

In this case, the Court agrees that remittitur is required. Applying the least intrusive standard, and considering the unique facts of this case, the Court orders remittitur in the amount of $5 million—leaving an award of $2.5 million. *Earl*, 917 F.2d at 1330 ("[W]e hold that district courts should use the least intrusive standard for calculating a remittitur. According to that standard, a district court should remit the jury's award only to the maximum amount that would be upheld by the district court as not excessive."). Alternatively, Mr. Greenaway can opt for a new trial on damages on the excessive force claim. Should Mr. Greenaway opt for a new trial, the Court will permit additional discovery limited to the issue of damages on the excessive force claim.

### b. Punitive Damages

The jury awarded Mr. Greenaway $100,000 from each County Officer Hudson and County Officer Stio in punitive damages. County Defendants argue that the punitive damages award, if any, should be a minimal amount. (County Defs.' Br. at 38–39.) Plaintiffs counter, in part, that the County Officers' decision to tase Mr. Greenaway four times coupled with the fact that there was no evidence that Mr. Greenaway was violent or otherwise resistant, justifies the imposition of punitive damages at $100,000 per officer. (Pls.' Opp. County Br. at 24–28.) The Court agrees.

In addition to considering comparative cases, district courts consider three factors when determining whether remittitur is appropriate for an award of punitive damages. *First*, the court must assess the reprehensibility of the conduct. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996) ("Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct."). *Second*, courts consider the ratio of punitive damages to that of the compensatory damages. *Id.* at 580 ("The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff."). *Third*, courts consider the civil and criminal penalties for comparable misconduct. *Id.* at 583 ("Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness.").

County Defendants' challenge to the jury award is largely based on County Defendants' view that the Officers' conduct was not "reprehensible."[9] (County Defs.' Br. at 38–39.) In particular, County Defendants contend that the Officers' conduct should not be deemed reprehensible because they "were performing their duties in securing Greenaway in the least intrusive manner, under the circumstances, and used the least force necessary to safely take Greenaway into custody and to the hospital, as his parents wished." (*Id.*) This argument is unavailing. It effectively assumes away the jury's determination—as evinced by the verdict—that the Officers' conduct was not reasonable under the circumstances and the force used was excessive. On the facts adduced at trial, there was ample evidence upon which a jury could find that the Officers' conduct was reprehensible.

---

[9] With respect to the second factor, County Defendants note only that because the compensatory damage award is "so grossly exaggerated," punitive damages should be "minimal." (County Defs. Br. at 38–39.) County Defendants do not address the third factor.

Further, the jury's award of $100,000 per officer falls within the range established by comparable cases.[10] In *Thomas v. Kelly*, an officer "over-reacted to a rather routine domestic violence dispute between [the plaintiff] and [his girlfriend], and in so doing, falsely treated him as a person who was suffering from a mental illness." 903 F. Supp. 2d 237, 245 (S.D.N.Y. 2012). The officer kneed plaintiff in the face, threw him to the ground, punched and kicked him, and falsely arrested him under N.Y. Mental Hygiene Law § 9.41. *Id.* at 267. For this conduct, the jury awarded $200,000, which was upheld by the district court. *Id.* at 269–70. Two other officers involved in the case were held liable to plaintiff for $100,000 and $25,000 in punitive damages even though their conduct was patently less egregious. *Id.* Similarly, in *Alla v. Verkay*, defendant police officers came into plaintiff's home with guns, handcuffed him, punched him, pushed him into a refrigerator, and falsely arrested him. 979 F. Supp. 2d 349, 357–58 (E.D.N.Y. 2013). Like here, plaintiff did not resist. *Id.* The *Alla* jury found each officer liable for $150,000 in punitive damages. *Id.* at 373. The punitive awards were upheld by the court. *Id.* at 375. These cases are not anomalies. *See, e.g.*, *King v. Macri*, 993 F.2d 294, 299 (2d Cir. 1993) (remitting jury verdict to $172,000 and $86,000, after inflation, in punitive damages where officers punched and placed plaintiff in a chokehold after he was placed in handcuffs); *O'Neill v. Krzeminski*, 839 F.2d 9, 13 (2d Cir. 1988) (upholding jury verdict of $278,000, $129,000, and $75,000, after inflation, in punitive damages where "while [plaintiff was] handcuffed and unable to defend himself, [he] was struck repeatedly about the head by two law enforcement officers"). Accordingly, County Defendants' motion with respect to punitive damages is denied.

---

[10] In viewing comparable cases, the district court may adjust the dollar amount for inflation. *See Dancy v. McGinley*, No. 11-CV-7952, 2015 WL 13214324, at *2 (S.D.N.Y. May 11, 2015) ("It is also appropriate for the court to adjust for inflation when comparing verdicts and remittitur orders in prior cases."), *aff'd*, 843 F.3d 93 (2d Cir. 2016).

County Defendants summarily state that the jury's $100,000 award on the false imprisonment claim should be reduced to $10,000 because of the "brief amount of time Greenaway was in custody by the County Defendants before being brought to the hospital." (County Defs.' Br. at 39.)  In support of this contention, County Defendants refer the Court to cases where awards of up to $10,000 were upheld for confinement ranging from three to five hours.  Here, Mr. Greenaway was confined at a hospital for almost two weeks.  As Plaintiffs note, County Defendants should be liable for at least some portion of that time.  *See, e.g.*, *Thomas*, 903 F. Supp. 2d at 264 (explaining that the time plaintiff spent at the hospital could factor into the compensatory damages award where there was no intervening cause that triggered plaintiff's hospitalization).  In addition, under his false imprisonment claim, Mr. Greenaway may be compensated for both his "emotional distress" and "loss of liberty."  *Martinez v. The Port Auth. of New York & New Jersey*, 445 F.3d 158, 161 (2d Cir. 2006) ("Nor did the District Court err in evaluating plaintiff's emotional distress and loss of liberty as separate components of his false arrest claim, inasmuch as we have held previously that such components are 'separable' and thus separately compensable.").  Based on these facts, among others, the Court cannot find the $100,000 jury award on Mr. Greenaway's false imprisonment claim excessive.  *See, e.g.*, *Graham v. City of New York*, 128 F. Supp. 3d 681, 715 (E.D.N.Y. 2015) (finding that "$150,000 is within the range of reasonable awards for [p]laintiff's combined injuries including (1) approximately one hour of lost liberty, (2) some minor physical pain and injury, and (3) past and future emotional harm, including fear, panic and humiliation"); *Sulkowska v. City of New York*, 129 F.Supp.2d 274, 308–09 (S.D.N.Y. 2001) (concluding that plaintiff who was humiliated during a false arrest and subsequent detention of around a half-day was entitled to $275,000—

roughly $390,000 in 2018 dollars—because she suffered from post-traumatic distress disorder with accompanying symptoms of depression, fear, and disturbed sleep).

<em>d.        Unlawful Entry / Trespass</em>

County Defendants argue that the $60,000 award on Plaintiffs' unlawful entry/trespass claim is excessive.  (County Defs.' Br. at 39.)  Comparable cases support County Defendants' contention.  *See, e.g.*, *Volunteer Fire Ass'n of Tappan, Inc. v. Cty. of Rockland*, 101 A.D.3d 853, 856–57 (2d Dep't 2012) (affirming jury award of $10,000 for trespass).  Accordingly, Plaintiffs' award is reduced to $10,000.

<strong>CONCLUSION</strong>

For the reasons set forth above, Village Defendants' post-verdict motions are granted in part, and denied in part.  Village Defendants' Rule 50(b) motion is denied in its entirety.  Village Defendants' Rule 59(e) motion with respect to the gross negligence and failure to intervene claims is granted and the following awards are reduced to zero:  (1) Mr. and Mrs. Knight's awards for their gross negligence claims against Village Officer Ohr; and (2) Mr. Knight, Mrs. Knight, and Mr. Greenaway's awards for their failure to intervene claims against Village Officers Ohr and Reado. Village Defendants' Rule 59(e) motion concerning Mrs. Knight's punitive damage award against Village Officer Reado is denied.

County Defendants' post-verdict motions are also granted in part, and denied in part. County Defendants' Rule 50(b) motion is denied in its entirety.  County Defendants' Rule 59 motion for a new trial is denied in its entirety.  County Defendants' Rule 59 motion for a conditional order of remittitur is granted only as to the issue of Mr. Greenaway's $7.5 million excessive force damage award.  Unless Mr. Greenaway agrees in writing, by April 25, 2018, to a remittitur reducing the award to $2.5 million, there will be a new trial solely as to the excessive

force damages.  Should Mr. Greenaway opt for a new trial, the Court will permit limited discovery.  Further, Mr. Knight, Mrs. Knight, and Mr. Greenaway's award for their unlawful entry/trespass claim against County Officers Hudson, Papa, Schmitt, and Stio as well as Village Officers Ohr and Reado is reduced to $10,000.  Mr. Knight, Mrs. Knight, and Mr. Greenaway's awards for their failure to intervene claims against County Officers Hudson, Papa, Schmitt, and Stio are reduced to zero.

The Clerk of Court is respectfully directed to enter judgment in accordance with this Order.

Dated: Brooklyn, New York                     SO ORDERED:
        March 31, 2018

                                            _____/s/LDH_____
                                            LASHANN DEARCY HALL
                                            United States District Judge